UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:06-HC-2212-BR

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARKIS REVLAND | PROPOSED FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

Comes now the Respondent, Markis Revland, by and through undersigned counsel, Assistant Federal Public Defenders Debra Carroll Graves and Sonya Allen, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

I. **INTRODUCTION**

Petitioner, the United States of America (the Government) instituted this civil action on December 6, 2006, seeking to commit Markis Revland (Mr. Revland or Respondent) as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 (the Adam Walsh Act or the Act) (18 U.S.C. §4248. DE # 1). The Government's petition states that mental health personnel for the Federal Bureau of Prisons (BOP) examined Respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Adam Walsh Act. Upon receipt of the petition, the District Court is required to stay Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.

Respondent filed a motion to dismiss contending that the Adam Walsh Act was

1

unconstitutional on numerous grounds. For over three years the constitutional challenges were advanced in the appellate courts. Respondent's case was ultimately remanded to the District Court. *United States v. Comstock*, 130 U.S. 1949 (2010). On January 27, 2011, Respondent requested a hearing pursuant to the Act to determined whether he qualifies for civil commitment under the Act. The hearing is scheduled to take place during this Court's November 28, 2011 term.

## II. FACTS

1. Markis Revland is 35 years of age at the time of his evidentiary hearing.

2. At the time of his hearing, Mr. Revland will have been incarcerated for almost five years past his release date.

3. Mr. Revland's release date from the Bureau of Prisons (BOP) was January 4, 2007.

### A. Personal History

4. Mr. Revland is a lifelong resident of Iowa. His parents divorced when he was young. He lived mostly with his father but he had frequent visits with his mother and also lived with her during some periods of his childhood. Despite several encounters with legal authorities at a young age, which resulted in him bouncing from school to school, Mr. Revland completed high school and one year of community college course work. He has held numerous short term jobs in restaurants starting at age 17 until his last arrest.

### B. Drug Abuse History

5. Mr. Revland's drug abuse history dates back to his late teens. Mr. Revland was a daily user of marijuana beginning at age twenty up until his last arrest, abstaining only when either incarcerated or incapacitated in some other fashion. He had numerous arrests for marijuana possession and impaired driving. In his early twenties he began abusing cocaine as well as methamphetamine on a regular basis. He entered Prairie Ridge Addiction Treatment Services in

Mason City, Iowa, a residential drug treatment facility, in 1999, at age 23. He was discharged after just 20 days. In June of 2000, he was found in possession of cocaine with the intent to distribute. He also had in his possession at the time a significant amount of marijuana and a quantity of methamphetamine. His criminal history reflects his difficulties with substance abuse.

### C. Criminal and Sexual Offense History

6. During his preteen years Markis began to get into trouble by stealing, typically from his mother. He was first adjudged delinquent at age 14. He was sent to various alternative and reform schools. By his late teens Markis had developed a serious drug addiction. He amassed a string of drug related offenses and offenses committed in support of his drug habit. He had numerous theft convictions and drug and drug paraphernalia convictions. He was placed on probation numerous times only to have his probation revoked. He failed to complete treatment.

7. In 1999, at age 23 to 24, Mr. Revland's arrest rate escalated. He amassed the following convictions: January 7, 1999 he was convicted of possession of marijuana and driving without a license; on June 9, 199 he was convicted of public urination; on June 11, 1999, he was convicted of drug paraphernalia and consuming a beer on the highway, on September 3, 1999, he was convicted of theft in the third degree; On September 13, 1999, he was convicted of possession f marijuana and indecent exposure; on November 15, 1999, he was convicted of possession of marijuana and possessions of weapons; on December 16, 1999, he was convicted of intoxicated driving and driving with a suspended license. All of the charges were misdemeanors for which he received various combinations of suspended jail sentences, probation and fines. The conviction for indecent exposure carried the most severe punishment. Mr. Revland was sentenced to 365 days, 350 days of which was suspended, in lieu of one year of probation. He was also ordered to register as a sex offender.

8. On June 24, 2000, Mr. Revland's probation for indecent exposure was revoked. His sentence of 180 days was activated. He was given credit for 15 days jail time previously served and for 20 days he spent in drug treatment. On June 27, 2000, law enforcement officers searched Mr. Revland's home and discovered marijuana, cocaine and methamphetamine among his belongings in the house he shared with a woman named Jennifer. Mr. Revland was released form jail in November of 2000 after serving the sentence for indecent exposure.

9. On January 15, 2001, Mr. Revland was charged with failing to register as sex offender. When his then girlfriend, Peggy learned that he was a convicted sex offender, serious problems developed in the relationship. On March 13, 2001, Mr. Revland was charged with domestic abuse, simple. Peggy had a young daughter at the time. Peggy was also pregnant with Mr. Revland's child. While Mr. Revland was in jail for the domestic abuse charge, Peggy obtained a no-contact order. She also accused Mr. Revland of sexually abusing her young daughter–an accusation that Mr. Revland vehemently denied.[1] Mr. Revland was charged with numerous violations of the no-contact order by virtue of his telephoning Peggy. All of those charges were later dismissed. In April of 2001, he was charged with possession with intent to distribute cocaine as a result of the drugs that were found in June, 2000. In addition, on May 6, 2001, he was charged with criminal mischief for throwing eggs at Peggy's house after he was released from jail. He was sentenced to one year of informal probation. On November 9, 2001, Mr. Revland violated the no-contact order by virtue of Mr. Revland spending several minutes with his newborn son at Mr. Revland's mother's house. He was fined $100. The domestic abuse charge was dismissed.

10. In March, 2001, when law enforcement officers went to Mr. Revland's father's house to

---

[1] Although an investigation was conducted by Child Protective Services and the case was referred to law enforcement, no charges were ever brought against Mr. Revland.

investigate the allegation of child sexual abuse, they discovered child pornography on Mr. Revland's father's computer. The child pornography was downloaded by Markis. Markis had lived with his father since his release from jail in November, 2000.

11. On January 28, 2002 Mr. Revland pled guilty to possession of cocaine with the intent to deliver (a result of the search on June 27, 2000) and was sentenced to 10 years imprisonment, with a mandatory minimum of three and one half years. On February 4, 2002 he pled guilty to possession of marijuana and interference with official acts. He was sentenced to two years imprisonment which was to be concurrent with the above felony sentence.

12. On March 22, 2002 Mr. Revland was charged for possession of child pornography in the Northern District of Iowa. The evidence showed that Mr. Revland had more than 10 but less than 150 images of child pornography on his father's computer. On July 26, 2002 he pled guilty to the charge in the Northern District of Iowa. On October 25, 2002, he was sentenced to 60 months imprisonment, which was to be followed by three years of supervised release. The sentence was ordered to be served concurrently with his sentence for possession with the intent to deliver cocaine in Iowa state court. The judge recommended that he serve his sentence at FPC Yankton, South Dakota.

### D. Situational Factors

13. Mr. Revland served his Iowa state sentence for his drug conviction at Mount Pleasant, Iowa. There he entered sex offender treatment to avoid placement in general population after his federal child pornography charges were made public through a local newspaper article.

14. Upon completion of the minimum required on his state sentence, Mr. Revland was designated to serve his federal sentence at USP Leavenworth, Kansas. Once there, he volunteered for the Butner Sex Offender Treatment Program (SOTP) to avoid the prospect of being victimized

by other inmates because he had a conviction involving child pornography. He was admitted to the SOTP and arrived at FCI Butner on July 22, 2005. Shortly after his arrival at Butner Mr. Revland revealed that he had been raped by a fellow inmate when at USP Leavenworth. In order to remain in the SOTP, Mr. Revland fabricated an extensive history of undetected sexual offending.

15. On October 19, 2006, Mr. Revland was discharged from the SOTP for violating participation rules.

16. On December 6, 2006, less than one month prior to his projected release from prison, Mr. Revland was certified as a sexually dangerous person under the Adam Walsh Act.

### E. Current Status

17. Mr. Revland has been held in prison for just under five years beyond his release date. If released, Mr. Revland will be on supervised release for a term of three years. The special conditions of supervision contained in his judgment of conviction include: that he participate in a mental health treatment program as directed by the probation officer, until such time as he is released from the program by the probation officer; that if he is granted possession of a computer/internet by the probation officer he shall consent to unannounced examinations of his computer by the probation officer; that he shall not associate with children under the age of 18 except in the presence of a responsible adult who is aware of the nature of his background and child porn offense and who is approved by the probation officer; that he shall not possess any form of pornography; that he shall submit to a program of psycho physiological assessment at his expense at the discretion of the probation officer, including the use of the penile Plethysmograph (PPG), to assist in treatment and monitoring; and, he shall register with state and local authorities as a convicted sex offender.

## III. EXPERT'S QUALIFICATIONS

16. The government retained Dr. Jeffrey J. Davis as an expert in this case. Dr. Davis reviewed Mr. Revland's records. Mr. Revland did not consent to an interview by Dr. Davis and no interview was given.

17. The government will also call Dr. Manuel Gutierrez as an expert in the case. Dr. Gutierrez reviewed Mr. Revland's records but did not conduct an interview of Mr. Revland.

18. Dr. Joseph Plaud was retained as a Respondent-selected court examiner. He interviewed Mr. Revland, reviewed his records, and completed a forensic evaluation on August 10, 2011.

19. Dr. Jeffrey Singer was retained as a second Respondent-selected court examiner. He interviewed Mr. Revland, reviewed his records, and completed a forensic evaluation on November 15, 2011.

20. The parties did not challenge the qualifications of any of the above experts. The court having reviewed the curriculum vitae of the experts, finds that each individual is qualified by education and experience to offer expert testimony in this matter.

## IV. LEGAL PRINCIPLES

**Standard of Proof and Elements Required to be Established**

21. The Government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but "by the Due process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "Clear and

convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001)(internal quotations and citations omitted). It has alternatively been described "as meaning 'highly probable.'" *Direx Israel Ltd.v. Breakthrough Med, Corp,* 952 F.2d 802, 810 n.7 (4th Cir. 1992)(quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)).

22. To commit Respondent, the Government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

23. This phrase has not been defined by statute. The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See*, H.R. Rep. No. 109-218(1) Section-by-Section Analysis and Discussion §511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 413.

24. A finding of dangerousness is also constitutionally required. *Kansas v. Crane*, 534 U.S.

407-409, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when](1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-8; quotations omitted)). *See also Foucha v. Louisiana*, 504 U.S. 71, 82-3 (1992).

25. The Court finds that in this regard, the statute and due process considerations require that, in addition to volitional impairment, the Government must prove by clear and convincing evidence that Respondent poses a risk of re-offense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

26. In this case the Government has proven neither. The evidence in this case does not demonstrate that Respondent currently suffers from volitional impairment. The evidence also demonstrates that the recidivism rates proposed by the government's experts fail to establish that Mr. Revland is likely to re-offend. Moreover a fair analysis of the actuarial assessments is that individuals with similar scores to that of Mr. Revland are highly unlikely to re-offend. Further, even if this Court were to credit the Government's experts regarding Respondent's likelihood of recidivism, the statistical evidence presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

## V. FINDINGS

### A. <u>Engaged in or Attempted to Engage in Sexually Violent Conduct or Child Molestation</u>

27. The Respondent, Markis Revland, has been convicted for misdemeanor indecent exposure and possession of child pornography. He has no convictions for hands-on sex offenses or

child molestation. Consequently, the government cannot satisfy the first prong of the Adam Walsh Act. The Act requires the government to prove by clear and convincing evidence that Respondent is a "sexually dangerous person." A "sexually dangerous person is defined as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." Because Mr. Revland has not engaged in or attempted to engage in sexually violent conduct or child molestation, the government cannot satisfy the first prong of the Act.

28. Dr. Jeffrey Singer has opined that it is "highly questionable whether Mr. Revland has engaged in 'sexually violent conduct'" as there are no demonstrable victims who have had physical contact with Mr. Revland. The Court credits this finding by Dr. Singer.

29. Dr. Plaud expressed the conclusion that Mr. Revland's convictions for indecent exposure and possession of child pornography caused him to answer the question in the affirmative that Mr. Revland had engaged in sexually violent conduct or child molestation.

30. Drs. Davis and Gutierrez focused on admissions Mr. Revland made in the SOTP to conclude that Mr. Revland has engaged in child molestation with scores of victims.

31. Mr. Revland disavows the admissions he made in the SOTP. He maintains that he claimed to have molested numerous children in order to satisfy his treatment providers and to remain in the program.

32. There has been no corroboration of the admissions made by Mr. Revland by way of charges or reports of peaks in criminal activity in the areas where Mr. Revland lived during the time frames of his claimed offending behavior.

33. The government experts also relied upon a "founded" allegation of sexual abuse by child protective services in Iowa in March of 2001. This incident arose when an allegation was

10

Case 5:06-hc-02212-BR-JG   Document 107   Filed 12/05/11   Page 10 of 16

made by the seven year old daughter of Peggy. The incident arose following Mr. Revland imposing discipline on alleged victim and her two year old brother. The investigation was conducted by Child Protective Services. An interview of Mr. Revland was conducted and he patently denied the allegation. The child was interviewed and the videotaped interview was turned over to law enforcement. No charges were brought against Mr. Revland. The evidence of this allegation of child molestation on the part of Mr. Reland is neither clear nor convincing. It cannot stand as a basis for satisfying the first prong of the Adam Walsh Act.

34. Dr. Singer and Dr. Plaud did not credit Mr. Revland's admissions in treatment or the CPS allegation in their assessment of Mr. Revland under the Adam Walsh Act. The Court agrees with Drs. Singer and Plaud in this regard. The evidence does not support a finding that Mr. Revland committed the acts he claimed nor the allegation that was "founded" by the CPS investigation, which resulted in neither a conviction nor charges by law enforcement.

### B. Suffers from a Serious Mental Illness, Abnormality or Disorder

35. Dr. Singer opined that Mr. Revland does not now suffer from a serious mental illness, abnormality or disorder of a sexual nature. He diagnosed Mr. Revland with the Axis I diagnosis of polysubstance dependence in full institutional remission. He diagnosed him as having an Axis II diagnosis of Antisocial Personality Disorder (ASPD). Singer Rpt. Page 16.

36. Dr. Plaud opined that Mr. Revland does not now suffer from a serious mental illness, abnormality or disorder. In his view Mr. Revland does not meet the diagnostic criteria for pedophilia or any other sexually-based disorder at this time." He noted that the DSM-IV-TR requires that the individual, over a period of at least six months, have recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with prepubescent child or children (generally age 13 or younger); and the person has acted on these urges, or the sexual urges

or fantasies cause marked distress or interpersonal difficulty and the person is at least age 16 and at least five years older than the child. Dr. Plaud saw no evidence that Mr. Revland currently met those criteria. Plaud Rpt page

37. Dr. Gutierrez opined that Mr. Revland suffers from a number of paraphilias, the most serious of which is pedophilia. He based his diagnosis on the records from the Butner SOTP. He also diagnosed Mr. Revland with the Axis II diagnosis of ASPD.

38. The Court finds the reasoning of Drs. Plaud and Singer persuasive on this point that Mr. Revland does not suffer from pedophilia. Mr. Revland's history and behavior clearly demonstrate that he struggles with substance abuse. His history is replete with the attendant criminal history. Moreover he appears to be a less than clever criminal who is typically so impaired that he is easily caught. There does not appear to be a basis for a diagnosis of pedophilia.

**C.** **Serious Difficulty Refraining from Sexually Violent Conduct or Child Molestation**

39. The opinions of the two experts offered by the government and the two court examiners continues to diverge. Dr. Jeffrey Davis and Dr. Manuel Gutierrez concluded that Mr. Revland would have serious difficulty in refraining from sexually violent conduct or child molestation. Their opinions are driven largely by their view that Mr. Revland has engaged in voluminous acts of child molestation in the past. Consequently they apply several actuarial instruments to conduct a risk assessment of Mr. Revland.

40. The use of actuarial instruments may be helpful in some cases. However such instruments are limited in that they provide risk of recidivism estimates for groups, not for a particular individual. Moreover, such instruments are limited in their application. For example the STATIC-99, which has been touted as the most validated of the actuarial instruments, is not

12

Case 5:06-hc-02212-BR-JG   Document 107   Filed 12/05/11   Page 12 of 16

recommended for use with those who have never committed a sexual offence. Singer Rpt. Page 12.

      41. The Court does not find that Mr. Revland has engaged in repeated, undetected instances of child molestation throughout his past. The Court finds more persuasive the views of Drs. Plaud and Singer who opine that Mr. Revland has shown serious difficulty refraining from drug use, but there is no evidence that he suffers from a serious mental illness, abnormality or disorder such that he would have serious difficulty refraining from sexually violent conduct or child molestation. Consequently the various actuarial instruments such as the STATIC-99R, the STATIC-2002R, the MnSOST-R, the SRA: FV Light and the RRASOR are of little use in this case.

      42. Dr. Gutierrez alone contended that a diagnosis of ASPD alone could support a conclusion under the Act that Mr. Revland would have serious difficulty refraining from sexually violent conduct or child molestation. However he could not point to any literature in support of his view.

      43. In formulating his opinion regarding whether Mr. Revland would have serious difficulty in refraining from sexually violent conduct or child molestation, Dr. Singer examined Mr. Revland's sexual offending, i.e., his convictions for indecent exposure and possession of child pornography, in the context of his mental state and found that his offending showed signs of psychological problems, issues and vulnerabilities, clearly exacerbated by substance abuses and by antisocial elements. However, it did not rise to the level of a paraphilia. Finally, upon viewing the most recent data analyzing the correlation between online offenders and contact sexual offenses, the latest data seems to suggest there is a distinct group of online offenders who pose relatively low risk of committing contact sexual offenses in the future. He concluded that neither the severity nor the functional impact of Mr. Revland's mental conditions rise to the level to establish a causal link to future acts of sexual violence. He offered his opinion within a reasonable degree of psychological

certainty. The Court finds that Dr. Singer's opinion is most soundly based in the evidence.

**VI. CONCLUSIONS**

44. The court finds that the government has not proven by clear and convincing evidence that Respondent has committed an act of sexual violence or child molestation.

45. The Court finds that Respondent does not meet the diagnostic criterial for pedophilia. The Court does find that Respondent meets the diagnostic criteria for Antisocial Personality Disorder and Polysubstance Dependence.

46. The Court finds that Antisocial Personality Disorder is not a serious mental illness, abnormality or disorder that can support a conclusion that Mr. Revland meets the criteria for commitment under the Adam Walsh Act. The Court finds that the government has not proven by clear and convincing evidence that Respondent suffers from a mental illness, abnormality or disorder a result of which he would have serious difficulty refraining from committing sexually violent conduct or child molestation.

47. The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior. *See Kansas v. Crane*, 534 U.S. 407, 411 (2002) (*citing Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)). The conflicting evidence concerning the probability of Mr. Revland's reoffending cannot support a finding that he would have "serious difficulty" in refraining from child molestation.

48. The Court has been presented with four opinions about Respondent's risk of sexual reoffense in the event he is released. The Court has considered the information and finds this information relevant to its determination of Respondent's sexual dangerousness. Having considered the reports, forensic evaluations and testimony of the four experts, as well as the other

evidence, the Court finds that the government has not proven dangerousness by clear and convincing evidence.

## Conclusion

For the foregoing reasons, the Court should enter judgment in this matter that Markis Revland is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons.

Respectfully submitted this 5th day of December, 2011.

THOMAS P. McNAMARA
Federal Public Defender


*s/ Debra Carroll Graves*
DEBRA CARROLL GRAVES
Assistant Federal Public Defender
Senior Trial Attorney
E-mail: Debra_Graves@fd.org
N.C. State Bar No. 13513


*s/ Sonya Allen*
SONYA M. ALLEN
Assistant Federal Public Defender
E-mail: Sonya_Allen@fd.org
N.C. State Bar No. 27194

Attorneys for Respondent
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
LR 57.1 Counsel, Appointed

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

**Michael James**
**G. Norman Acker , III**
**R. A. Renfer , Jr.**
U.S. Attorney's Office
310 New Bern Ave.
Suite 800
Raleigh, NC 27601-1461
Email: mike.james@usdoj.gov
Email: norman.acker@usdoj.gov
Email: rudy.renfer@usdoj.gov

**Michael D. Bredenberg**
Federal Medical Center
P. O. Box 1600
Butner, NC 27509
Email: mbredenberg@bop.gov

by electronically filing the foregoing with the Clerk of Court on December 5, 2011, using the CM/ECF system which will send notification of such filing to the above.

This the 5th day of December, 2011.

/s/ Debra Carroll Graves
DEBRA CARROLL GRAVES
Assistant Federal Public Defender
Attorney for Respondent
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236; Fax: 919-856-4477
E-mail: Debra_Graves@fd.org
N.C. State Bar No. 13513
LR 57.1 Counsel, Appointed