UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

UNITED STATES OF AMERICA,

      Petitioner,                           Civil Action No. 5:06-HC-02212

vs.                                       HON. BERNARD A. FRIEDMAN

MARKIS REVLAND,

      Respondent.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

       This is a civil commitment proceeding, commenced by the government pursuant to 18 U.S.C. § 4248. On December 5-7, 2011, the court conducted a hearing pursuant to 18 U.S.C. § 4247(d), as required by § 4248(c). The court heard the arguments of counsel as well as the testimony of the numerous witnesses called by both sides. The matter now being ripe for decision, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1).

       The government commenced this matter by filing a document in this court entitled "Certification of a Sexually Dangerous Person." *See* docket entry 1. Pursuant to § 4248(a), the filing of such a certificate "shall stay the release of the person pending completion of procedures contained in this section." The referenced procedures require the court to "order a hearing to determine whether the person is a sexually dangerous person." § 4248(a). A "sexually dangerous person" is "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." § 4247(a)(5). "Sexually dangerous to others"

means "that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." § 4248(a)(6).

Under § 4248(d), it is the government's burden to prove by clear and convincing evidence that respondent meets these statutory definitions.[1]  That is to say, in the present case the government must prove by clear and convincing evidence both (1) that respondent "has engaged or attempted to engage in sexually violent conduct or child molestation" and (2) that respondent "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  The parties have stipulated that these are the only issues before the court.  *See* Jt. Final Pretrial Ord. ¶ IV (docket entry 100).  If the government fails to prove these elements by clear and convincing evidence, then it has failed in its burden to prove that respondent is a sexually dangerous person.

---

[1] While "clear and convincing evidence" is not statutorily defined, there is no dispute that this standard requires a greater degree of proof than a preponderance of the evidence, yet less than beyond a reasonable doubt.  *See, e.g., Addington v. Texas*, 441 U.S. 418, 425 (1979) (noting that the "intermediate standard of clear and convincing evidence" lies "between a preponderance of the evidence and proof beyond a reasonable doubt").  Standard jury instructions commonly define the clear and convincing evidence standard in the same way.  *See, e.g.,* 3 Fed. Jury Prac. & Instr. § 104:02 (6th ed. 2011) ("'Clear and convincing evidence' is evidence that produces in your mind a firm belief or conviction as to the matter at issue. Clear and convincing evidence involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.").  The Fourth Circuit has indicated that clear and convincing "has been defined as 'evidence . . . of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established,' . . .  and, as well, as evidence that proves the facts at issue to be 'highly probable.'" *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001).

In this event, respondent may not be further detained under § 4248. On the other hand, if the government proves all of these elements by clear and convincing evidence, then it has proven that respondent is a sexually dangerous person. In that event, the court must order respondent to be committed for care and treatment pursuant to § 4248(d).

### The First Element: Respondent's History of Sexual Violence or Child Molestation

The government must first prove that respondent "has engaged or attempted to engage in sexually violent conduct or child molestation." In the present case, the government does not contend, and it presented no evidence suggesting, that respondent has engaged or attempted to engage in sexually violent conduct. Rather, the government contends only that respondent has engaged in child molestation.[2] Having heard the testimony and reviewed all of the hearing exhibits, the court finds and concludes that the government has not proven this element by clear and convincing evidence.

The government showed, and respondent conceded, that respondent has a long criminal record. The presentence investigation report for respondent's 2002 conviction for possession of child pornography (Pet.'s Ex. 30), which comprehensively summarizes respondent's criminal history, shows many convictions beginning when respondent was just 12 years old for various offenses including theft, burglary, driving while license suspended, making a false police

---

[2] The term "child molestation" is not defined in 18 U.S.C. §§ 4247 or 4248. By regulation, the Bureau of Prisons ("BOP") has defined the phrase as "includ[ing] any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." 28 C.F.R. § 549.93.

3

report, possession of marijuana and drug paraphernalia, disorderly conduct, public urination, driving while intoxicated, indecent exposure, possession of cocaine with intent to deliver, and criminal mischief. However, none of the convictions were for sexually violent conduct or child molestation, either actual or attempted.

Respondent's only convictions, which conceivably could be labeled as somehow involving child molestation, were two incidents of indecent exposure. The first incident occurred on February 5, 1999; the second occurred on July 4, 1999. In the first incident, a citizen complained to police that respondent exposed himself to the citizen's eight-year old daughter. *See* Pet.'s Ex. 18. Respondent told the arresting officer that he was urinating when the girl walked around the corner unexpectedly. While respondent was initially charged with indecent exposure, he was eventually convicted only of public urination and the indecent exposure charge was dismissed. *See* Pet.'s Ex. 30, pp. 11-12 ¶ 45. In the second incident, a citizen complained that respondent "was walking back and forth near some kids and that he exposed his genitals twice and then quickly left when the mother came outside." Pet.'s Ex. 19, p. 1. Respondent allegedly later admitted to a police officer that he had exposed himself. *Id.* Respondent was charged with, and pled guilty to, indecent exposure, and he was required to register as a sex offender, although none of the court documents mentions children. *See* Pet.'s Ex. 21, 23, 24, and 30, pp. 13-14 ¶ 48.

The government did not offer clear and convincing evidence that either of these indecent exposure incidents constituted "child molestation," either actual or attempted. As noted above, the Bureau of Prison's definition of the term requires "conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." The government does not suggest that either incident involved "exploitation" of minors. And while minors were *present* and allegedly saw

4

plaintiff's exposed genitals, the government did not prove that respondent engaged in conduct of a sexual nature *with* them. Nor was there any evidence that respondent touched any children during these incidents.

The government also attempted to show that respondent engaged in child molestation by pointing to evidence that respondent may have molested his girlfriend's seven-year old daughter, "M," in 2001. According to a Child Protective Assessment Summary, on March 13, 2001, M allegedly told her mother, Peggy, that respondent "touched her privates and made her touch his privates." Pet.'s Ex. 27, p. 2. On April 9, 2001, M told a social worker that respondent once touched her pubic area and that on another occasion respondent had M "put my hand down his pants." *Id.* at 9. The case was assigned to a Child Protection Worker, Sharon Smith, who interviewed Peggy and respondent and reviewed the social worker's report. Smith concluded that the allegations of sexual abuse were "confirmed . . . by a preponderance of the evidence" and forwarded her report to the county prosecutor with a recommendation that criminal charges be filed. *Id.* at 11-12. There is, however, no evidence that the county prosecutor took any action.

The government did not offer clear and convincing evidence that respondent ever molested M. The government's only evidence of the two incidents at issue is that M made an allegation and that a case worker found the allegation to be credible by a preponderance of the evidence. Respondent has consistently denied M's allegations. The case worker's report itself contains inconsistencies, which cause the court to give it little weight. The court notes that, according to this report, Peggy told a police officer that M had said: "The other night when you asked me if *Daddy* touched me in bad places, I lied. He really did." *Id.* at 6 (emphasis added). Respondent is not M's father. M's allegations are also somewhat inconsistent regarding the times

when the two incidents allegedly occurred. She allegedly told her mother on March 13, 2001, that the incidents had occurred "a long time ago," *id.* at 2, but she told the social worker on April 9, 2001, that she had "kept it secret" for "[j]ust a couple of days, maybe a month." *Id.* at 9.[3] Moreover, it would be incongruous to say the least if the government could meet its burden of proving the molestation by clear and convincing evidence by relying on an administrative determination that the allegations of molestation were, in the Child Protection Worker's opinion, deemed to be "confirmed" by a preponderance of the evidence.

The court also finds it highly significant that the local prosecutor failed to pursue charges, as this suggests that he did not believe he had probable cause to do so. At the hearing the government suggested that the prosecutor may have decided not to pursue child molestation charges because they were overshadowed by respondent's prosecution on federal child pornography charges. The court rejects this explanation for the local prosecutor's inaction. Smith forwarded her report to the county prosecutor on April 11, 2001. *See* Pet.'s Ex. 27, p. 12. Respondent's father's computer, on which child pornographic images were found (which eventually led to respondent's child pornography charges), was seized approximately six weeks later, on May 24, 2001. *See* Pet.'s Ex.30, p. 4 ¶ 11. Respondent was not indicted for possession of child pornography until March 2002. *See* Pet.'s Ex. 28. This sequence of events lends no credence to the government's theory as to why the county prosecutor took no action in April 2001 regarding M's allegations. The only reasonable explanation, based on this time line, is that the prosecutor did not believe he had a case.

---

[3] Further, it should be noted that one of respondent's expert witness, Dr. Joseph Plaud, testified he believed this report deserved no weight in evaluating respondent's sexual history and sexual dangerousness because, among other reasons, the social worker who interviewed M was "pulling for yeses," that is, coaching for incriminating statements. The court agrees with Dr. Plaud on this point.

On this record, the court has no way of knowing whether respondent did, or did not, molest M. What can be said with confidence is that the government has failed to prove, by clear and convincing evidence, that he did so or that he attempted to so do.

The only other evidence submitted by the government in an effort to show that respondent has engaged in child molestation is information respondent "self-reported" while enrolled in the sex offender treatment program ("SOTP") at FCI-Butner. In this context, respondent "admitted" to 149 incidents of "hands-on" sexual abuse of minors of all ages. *See* Pet.'s Ex. 36 (Psychosexual History Questionnaire, or "PHQ").

The court heard a great deal of argument and expert testimony as to whether any of these 149 incidents actually occurred. Having considered the matter carefully, the court concludes that the government has failed to prove by clear and convincing evidence that they did.

The court finds that respondent invented the 149 incidents because he was desperate to remain in the SOTP at FCI-Butner. Respondent testified, quite convincingly, that he had been beaten and raped at knifepoint by fellow inmates while incarcerated at the federal prison in Leavenworth, Kansas; that he feared for his life if he remained at Leavenworth; that he sought and obtained admission to FCI-Butner's SOTP in order to be transferred away from Leavenworth; that once in the SOTP he was encouraged by SOTP staff to "get it all out," i.e., "confess" everything; and that he felt compelled to make up a long list of sex offenses, lest he be deemed "uncooperative" and returned to the institution from which he had come.[4] The court finds that all of the 149 incidents

___

[4] While the court credits this testimony, as well as certain other aspects of respondent's testimony where noted (*see, e.g.,* n. 6, *infra*), the court did not find respondent to be a credible witness overall. The expert witnesses unanimously indicated that one feature of antisocial personality disorder, which respondent clearly suffers, is a tendency to lie and deceive. Even respondent's experts testified that they viewed everything respondent has said with great

7

reported by respondent on his PHQ were the product of his imagination, not actual events. Drs. Jeffrey Singer and Joseph Plaud, both of whom testified as respondent's experts, indicated that participants in FCI-Butner's SOTP are expected to "admit" substantial numbers of "hands-on" victims. They described this as part of the "milieu" of the program and doubted that any of respondent's self-reported admissions had actually occurred, characterizing his PHQ as "nonsense" and "not pass[ing] the smell test." The court agrees with Dr. Singer's and Dr. Plaud's assessment.

Further, the PHQ is unbelievable on its face. Many of the reported incidents allegedly occurred when defendant was 26 years old. *See* Pet.'s Ex. 36, Bates 1119-1121, 1132-1135, 1144, 1159-1162, 1179-1180, 1189; Pet.'s Ex. 37, Bates 1225-1227. Yet this was impossible, as respondent was in state prison at the time, serving a sentence for possession of cocaine with intent to distribute.[5] The reported incidents were not only too numerous to believe but also recounted – years afterwards – far too precisely, with respondent providing the age of the victim, the time of day (exhibitionism incidents) when each offense occurred, and the location where each incident

---

skepticism. The court agrees with this analysis of the respondent's credibility and, for this reason, the court was particularly cautious in weighing respondent's testimony.

[5] Respondent was born on 6-7-76. *See* docket entry 61, p. 1 (unredacted report of Dr. Jeffrey Davis, Ph.D.). He therefore turned 26 on 6-7-02. On 1-28-02, approximately four and one-half months before his 26th birthday, respondent was sentenced to prison for 10 years for possessing cocaine with intent to distribute. *See* Pet.'s Ex. 30, p. 14 ¶ 49. Respondent testified at the hearing, and the government offered no evidence to the contrary, that he has been continuously incarcerated since being sentenced on that charge. Therefore, all of respondent's self-reported "admissions" of child molesting activity when he was 26 years old were obvious fabrications. Respondent's "admissions" of such activity when he was 24 and 25 years old are suspect for the same reason. Respondent was in jail for at least four months when he was 24 years old. *See* Pet.'s Ex. 30, p. 13 ¶¶ 47-48. And he began serving his 10-year sentence for possession of cocaine with intent to distribute when he was approximately 25 years and seven months old.

8

allegedly occurred.[6]  As one of the expert witnesses testified, respondent would be the Charles Manson of child molesters if even a small portion of the 149 incidents had actually happened.  And yet the government offered no evidence to independently verify that any of these incidents occurred or that any of them – even one – ever resulted in investigation or prosecution.  This by itself convinces the court that the 149 incidents most likely were invented.  Had the incidents actually occurred, one or more of the victims would have spoken up, as Dr. Plaud testified.  It is quite simply impossible to believe that respondent could have committed so many child molestation crimes without ever being detected, particularly considering his absolute failure throughout his teens and early 20s to commit many other types of crimes on a regular basis without being arrested.  As Dr. Singer noted, respondent was a rather clumsy criminal and could not "spit on the sidewalk" without being caught.

　　　　　For these reasons, the court finds and concludes that the government has failed to prove by clear and convincing evidence that respondent has ever engaged or attempted to engage in sexually violent conduct or child molestation.


***The Second Element: Does Respondent Suffer from a Serious Mental Illness, Abnormality or Disorder as a Result of Which He Would Have Serious Difficulty in Refraining From Sexually Violent Conduct or Child Molestation if Released?***

　　　　　The second element has two related parts.  First, does respondent have a serious mental illness, abnormality or disorder?  Second (assuming the answer to the first question is "yes"),

---

[6] Respondent's "admissions" were so lengthy and detailed, he testified he had to keep a "cheat sheet" in order to remember what he had reported. The cheat sheet was one of the items seized from respondent's cell during a search and offered in evidence at the hearing.  *See* Pet.'s Ex. 56.  The court credits respondent's testimony regarding the purpose of this cheat sheet.

would this illness, abnormality or disorder cause respondent to have "serious difficulty in refraining from sexually violent conduct or child molestation if released"? The court finds and concludes that the government proved the first part of this element by establishing that respondent has antisocial personality disorder. However, the court also finds that the government failed to prove the second part of this element – the causal connection between the disorder and difficulty refraining – by clear and convincing evidence.

The government contends that respondent has "pedophilia, primarily attracted to females, non-exclusive type, and antisocial personality disorder." *See* Pet.'s Proposed Findings of Fact and Conclusions of Law ¶ 74 (docket entry 106). While the court finds that respondent has antisocial personality disorder, the government has not shown by clear and convincing evidence that respondent has pedophilia or that respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

The experts gave differing opinions as to whether respondent has a serious mental illness, abnormality or disorder. Dr. Manuel Gutierrez, a Psy.D. psychologist, who conducted a forensic evaluation on behalf of the Bureau of Prisons in late 2006 and early 2007, and again in April 2011, but did not examine respondent, concluded that respondent has pedophilia, fetishism, frotteurism, polysubstance dependence, and antisocial personality disorder. *See* Pet.'s Ex. 3, p. 14; Pet.'s Ex. 4, p. 5. Dr. Jeffrey Davis, a Ph.D. psychologist who likewise conducted a "paper review" of respondent's case at the government's request, concluded that respondent has pedophilia, exhibitionism, frotteurism, voyeurism, fetishism, alcohol dependence, amphetamine abuse, cannabis abuse, cocaine abuse, hallucinogen abuse, and antisocial personality disorder. *See* Pet.'s Ex. 7, p. 43. Dr. Joseph Plaud, a Ph.D. psychologist who evaluated respondent at respondent's request in July

and August 2011, concluded that respondent "does not meet the diagnostic criteria for pedophilia or any other sexually-based disorder at this time." Pet.'s Ex. 10, p. 12. Dr. Jeffrey Singer, a Ph.D. psychologist who also evaluated respondent at respondent's request, concluded that respondent has polysubstance dependence and antisocial personality disorder. *See* Pet.'s Ex. 14, p. 16. Dr. Lela Demby, a Ph.D. psychologist who testified by deposition, diagnosed respondent with "personality disorder, not otherwise specified." Demby Dep. (Pet.'s Ex. 16) at 87 .

Having heard the experts' testimony and having reviewed their reports, the court concludes that the government has proven by clear and convincing evidence only that respondent has antisocial personality disorder, not pedophilia or any other paraphilia. In diagnosing pedophilia, Drs. Gutierrez and Davis relied heavily on respondent's "self-reports" of child abusive activity and on the incidents of abuse alleged by M, all of which the court has excluded from consideration for the reasons indicated above. Drs. Plaud and Singer correctly discounted the self-reports and M's allegations and focused on respondent's documented behavior. They concluded, as does the court, that the record simply does not support a diagnosis of pedophilia. As Dr. Singer noted, "Mr. Revland has demonstrated no pattern or syndrome consistent with a paraphilia. . . . There is no behavioral data to support the presence of a preferred deviant pattern of arousal, the essential element of any paraphilia diagnosis." Pet.'s Ex. 14, p. 16. Dr. Plaud specifically noted the absence of evidence to support either the A, B or C criteria required for a diagnosis of pedophila under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR").[7] Based on all of the evidence presented at trial, a diagnosis of pedophilia is not clearly and

---

[7] At pages 11-12 of his report, Pet.'s Ex. 10, Dr. Plaud quotes these criteria as follows:

A. Over a period of at least 6 months, recurrent, intense sexually

convincingly supported.[8]

The evidence does support a diagnosis of antisocial personality disorder.  The court is persuaded by Dr. Davis' discussion of this disorder at pages 47-48 of his report.  *See* Pet.'s Ex. 7.  The significance of this finding, however, as it relates to respondent's sexual dangerousness is nil.  The essence of this disorder is that the patient "fail[s] to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest."  *Id.* at 48.  Dr. Singer testified that the vast majority of prison inmates have this disorder, as they are in prison for breaking the law and failing to conform to social norms.  Dr. Plaud testified that there is no documented causal link, in this case or in general, between antisocial personality disorder and sexual dangerousness.  The court credits these experts' opinions.

---

arousing fantasies, sexual urges or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

B. The person has acted on these urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

C. The person is at least 16 years and at least 5 years older than the child or children in Criterion A.

[8] At the hearing the government made much of the fact that a search of respondent's cell at FCI-Butner found pictures of children cut out from magazines, as well as dance costume catalogues which included some pictures of young girls in leotards and tutus.  The government offered some of these images as hearing exhibits.  *See* Pet.'s Ex. 50.  The images were not pornographic by any stretch of the imagination.  Respondent testified that he ordered the catalogues because he needed their size charts for his crochet projects. Regardless of respondent's motives, the court finds that his collection of cut-out pictures and dance costume catalogues was harmless and not supportive of a diagnosis of pedophilia.  The court also agrees with Dr. Singer's conclusion that "[c]onsidering that Mr. Revland has never had a "hands-on" offense, during a substantial period of severe polysubstance abuse, during the peak period of the male sexual response cycle, it is unlikely that such material would fuel a future 'hands-on' sex offense."  Pet.'s Ex. 14, p. 11.

The final issue is whether respondent's serious mental illness, abnormality or disorder (in this case, antisocial personality disorder) will cause respondent to have serious difficulty in refraining from sexually violent conduct or child molestation if released. Having reviewed the experts' reports and listened to their testimony, the court finds that the government has failed to make such a showing by clear and convincing evidence.

First, the court credits Dr. Plaud's testimony that there is no documented causal connection between antisocial personality disorder and sexual dangerousness.

Second, the government's experts, in attempting to assess the likelihood that respondent might reoffend sexually, relied heavily on so-called "actuarial instruments," which purport to predict recidivism rates based on historical data of sex offenders who have been tracked in the past. Dr. Gutierrez used the STATIC-99R test.[9] Dr. Davis used the STATIC-99R, the STATIC-2002R and the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) tests.[10] The

---

[9] According to Dr. Gutierrez,

> On the STATIC-99R, the respondent obtained a score of 6 of a scale that theoretically ranges from 0-12, with 12 at the high end of risk. Offenders with the same score from the preselected High Risk/Need Group have been found to sexually reoffend at a rate of 31.2% in five years and 41.9% in 10 years. According to this instrument, the score of 6 places Mr. Revland in the High risk category.

Pet.'s Ex. 4, p. 8.

[10] Dr. Davis gave respondent a score of 6 on the STATIC-99R and reported the same recidivism figures as did Dr. Gutierrez. *See* Pet.'s Ex. 7, p. 49. On the STATIC-2002R, Dr. Davis gave respondent a score of 11 and reported recidivism statistics of 55% and 64.6% in five and ten years, respectively. *Id.* at 50. On the MnSOST-R test, Dr. Davis gave respondent a score of 12 and reported a recidivism rate of 30% over six years. *Id.* All three tests placed respondent in the "high" risk category.

13

court rejects the use of these "instruments" as a means of assessing the degree to which, if at all, that respondent will have serious difficulty in refraining from child molestation if released. Dr. Davis conceded that actuarial instruments are only "moderate predictors of sexual reoffense." Pet.'s Ex. 7, p. 49. Dr. Singer testified they are "mediocre at best," and in his report he indicated that due to their low predictive value such instruments should not be used in an effort to predict the dangerousness in an individual case. *See* Pet.'s Ex. 14, pp. 12-13 ("The use of actuarial instruments under these conditions can be likened to a cardiologist applying a life insurance actuarial table to make a diagnosis of cardiac disease."). The risk assessments offered by Drs. Gutierrez and Davis are particularly unreliable in the present case because they both assumed that respondent is a pedophile with numerous "hands-on" victims, whereas the court has rejected both of these premises. The court rejects the conclusion of these experts that respondent would have serious difficulty in refraining from child molestation if released.

The court credits and accepts the conclusions of Drs. Singer and Plaud that respondent is not sexually dangerous and that his risk of sexual reoffense is low. *See* Pet.'s Ex. 14, p. 17; Pet.'s Ex. 10, pp. 3, 13-14. The court specifically adopts Dr. Singer's conclusion that respondent "does not have a mental disorder that predisposes him to sexually reoffend, let alone causally links him to future sex offending behavior that he has substantial difficulty controlling of the severity to meet the Adam Walsh Act standards." Pet.'s Ex. 14, p. 17. In this context it is important to note that respondent has no documented history of ever having committed a "hands-on" sexual offense.

### *Conclusion*

For these reasons, the court finds and concludes that the government has failed to prove by clear and convincing evidence that respondent "has engaged or attempted to engage in sexually violent conduct or child molestation." The court also finds and concludes that the government proved by clear and convincing evidence that respondent has a serious mental illness, abnormality, or disorder – namely, antisocial personality disorder. Finally, the court finds and concludes that the government failed to prove by clear and convincing evidence that, as a result of his antisocial personality disorder, respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released. The government has therefore failed to prove that respondent is a sexually dangerous person under 18 U.S.C. § 4248.

_____/s/_____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE
SITTING BY SPECIAL DESIGNATION

Dated: December 22, 2011
        Detroit, Michigan